Jessica Liu for Guangdong. Go ahead. Good morning. May it please the Court. Jessica Liu from WaGaChil Manji's on behalf of appellants collectively referred to as Midea. This matter is a simple contract interpretation issue. The narrow question before this Court is whether, under the terms of the relevant contract, Midea was required to continue indemnifying a former customer after the contract was assigned to a new customer. To answer this question, the Court need only look within the four corners of the Master Supply Agreement, at the express language negotiated by the parties. Multiple provisions with unique, bespoke language make clear that the MSA and the purchase orders made a part thereof constituted an indivisible contract that, once assigned to a new customer, relieved Midea of any obligation to continue indemnifying its former customer. First, Section 17.7, the Indivisibility Clause of the Master Supply Agreement, provides, quote, this agreement, which refers to the Master Supply Agreement itself, the purchase orders, PIs, and any attachments hereto, all of which are hereby incorporated by reference into this agreement and made a part hereof. Section 17.7 is not the typical boilerplate integration clause which appellees would have you believe. That boilerplate integration clause already exists elsewhere in the Master Supply Agreement on page 1 and says what you would expect a boilerplate integration clause to say, that the MSA constitutes the entire agreement between the parties. Section 17.7, unlike the boilerplate integration clause, expressly calls out purchase orders as incorporated by reference and made a part hereof. Under principles of contract interpretation long established, these words cannot be ignored and rendered meaningless. Rather, they must be harmonized with other provisions in the MSA and given legal effect. Their meaning is pretty plain. The purchase orders are incorporated in and made a part of the Master Supply Agreement itself. Second, Section 17.2's assignment clause provides that, notwithstanding the limitation on assignment in the foregoing sentence, either party may assign this agreement in its entirety, including all purchase orders and PIs. The words in its entirety and including all purchase orders, when used together, again have a specific intended meaning, that the entirety of the agreement contains the purchase orders as a part of that agreement, which reading is also entirely consistent with the plain words of Section 17.7 and applicable law regarding the meaning of the word including. What Section 17.2 does not say is either party may assign the agreement in part or in whole. It does not say that either party may assign the agreement including certain purchase orders or including only open purchase orders. It doesn't say the words together with all purchase orders or in addition to all purchase orders. These are all plausible alternative ways to draft the language if the original parties had wanted to give them the meaning that appellees now seek to ascribe to these words in this provision. Third, Section 1.3 of the Master Supply Agreement expressly states that the MSA provides a legal and contractual framework governing all purchase orders. And, quote, the agreement applies to all purchase orders written or oral placed by customer. I'll skip a few words and whether or not the purchase order or P.I. refers to this agreement. Fourth, Section 2.2 of the Master Supply Agreement provides that the purchase of product and payment for such purchases are under the Master Supply Agreement. All these provisions Section 2.2. All these provisions when read together are more than enough under applicable law for this Court to hold that the Master Supply Agreement and the purchase orders constitute an indivisible agreement. Counsel, can you tell me just kind of a practical question just because it's a practical question. So if you don't prevail here and we affirm what the lower courts did, MIDEA would owe indemnification to Correll, right, with respect to purchase orders. Correct. Whereas if you prevail, MIDEA would only owe indemnification to the assignee of the MSA. What is the practical difference? Why is that important to MIDEA to prevail on that? It's important to MIDEA because the way we've always viewed and operated under this contract is we have only one single customer to whom we owe an indemnity obligation. And that would be the assignee. To provide that we now owe indemnification obligations to the assignee as well as Correll means that we are exposed to potential claims that were not originally contemplated for and priced into the contract under the original agreement from MIDEA's point of view. Okay. Isn't the product the same? It's just a difference in who sold the product? In other words, if Correll had not gone into bankruptcy and hadn't sold or this part hadn't been assigned, wouldn't MIDEA still have the duty to indemnify for the claims based on the product sold? Under the terms of the agreement, to the extent that Correll remained an existing customer at the time that an indemnification claim was tendered for indemnity to MIDEA, then yes, MIDEA would pay out on the indemnification claim. So now you just have sort of a timeline from when the contract was assigned. You have to indemnify for Correll for claims from before the assignment and the purchaser after the assignment. But it's still, in other words, you'd have to indemnify either way, correct? We would have to indemnify only the existing customer at the time. And there is a question as to whether or not there are any outstanding indemnification claims owed. For many reasons, we have fully performed, is our view. Is there any language in the contract or the MSA that says if you assign the contract, then you lose the right to indemnification? Yes, absolutely. And I was about to get there, so I will jump there right now. So let's look at the indemnity provision itself and also the assignment provision, which I've referred to before. Under the indemnity provision, which is Section 16.2, it provides that suppliers shall indemnify and hold harmless customer and its affiliates. Customer is defined to cover the specific legal entity that is then the counterparty to the contract. Section 6.2 does not say prior customer, as in or, predecessor in interest, or any variation thereof. This reading is further supported by the fact that neither the MSA nor the purchase orders provide for survival of indemnification obligations after assignment. And it's pretty clear from the terms of the MSA that the parties knew how to include survival language when they intended obligations to continue. In Section 8.2 of the MSA, there's language that provides that the exclusivity period of the contract shall survive termination of the agreement indefinitely. Elsewhere in the agreement, Section 10.10 writes in obligations of the entity, specifically enumerated, which does not include indemnity, shall survive termination or expiration of this agreement. And there are multiple other provisions where, again, the expressed intent to the parties was to have that agreement survive, that provision survive. Here, there is no such survival language for a situation where the contract is fully assigned and the existing customer is replaced entirely by a new customer. I guess this question probably goes to the course of performance, but did Medea and Correll ever agree to terms in an individual PO that contradicted the MSA, contradicted the terms of the MSA? No, they never did, Your Honor. And it's a good question. The way the purchase orders worked was that some of the purchase orders that were provided to Medea had additional terms and conditions and others did not. It was, frankly, somewhat inconsistent. In all cases, unless Medea agreed to accept those additional terms and conditions, which it never did, the terms of the master supply agreement would govern. The bankruptcy court, in fact, found that the additional terms and conditions, to the extent that they contradicted the MSA, were never accepted by Medea as required under the Uniform Commercial Code. And therefore, a binding contract did not exist with respect to the new and different terms under the purchase orders, and the purchase orders themselves could not serve as the basis for indemnification. So the sum of that is that you look to the MSA's indemnification clause. So you're saying the parties did not negotiate over the terms of an individual purchase order? Correct. In the sense that Medea did not accept the terms of the additional purchase order as modifying the terms of the master supply agreement. Okay. Thank you. Further, I'll note that the contractual indemnity cannot be separated from the underlying master supply agreement under Section 365 of the Bankruptcy Code. So if this Court agrees that the master supply agreement and the purchase orders constitute an indivisible agreement, which the case law supports, then Thornhill requires that this Court reverse the bankruptcy court. Under Thornhill, regardless of whether a party seeks to assign rights under a contractual indemnity or the actual contractual indemnity provision itself, neither is permissible under Section 365 when the contract itself is an indivisible agreement. The key principle guiding this is that a debtor cannot use Section 365 to create a different deal than the one that it had originally. As we've already discussed, under the assignment provision, in a non-bankruptcy scenario, the language in the assignment clause required that the agreement be assigned in its entirety, including all purchase orders. In bankruptcy, the debtor should not be able to do something different, assign some purchase orders, but not all purchase orders. Thornhill is directly applicable here, notwithstanding what appellees may say. It addressed a situation where a debtor franchisee attempted a partial assignment of a franchise agreement so that it could avoid bearing the economic responsibility for a large personal injury claim. The case even included an agreement similar to here, whereby the debtor agreed to remain on a lawsuit nominally for the purpose of the personal injury claimant recovering against a franchisor. Thornhill's holding is not made inapplicable simply because, as appellees allege, a party attempts to assign rights arising under a contractual provision versus a contractual provision itself. The general principle of Thornhill still holds true. Moreover, appellants misread Thornhill as it clearly says in the decision that it deals with rights arising from a contractual indemnity contained in the franchise agreement. With that, Your Honor, we believe that the plain and clear, unambiguous language of the master supply agreement indicates that the master supply agreement and the purchase orders together are an indivisible agreement, and therefore the bankruptcy court's decision should be reversed. Okay. You've saved time for rebuttal. And now we'll hear from David Parham for the Correll Brands. Ed Owen. Good morning. May it please the Court. David Parham on behalf of the Correll Parties. Let me start by saying we think this is a very straightforward case, that under state law and bankruptcy law, the intent of the parties is clear and it's unambiguous that the supply agreement and the purchase agreement or purchase orders are divisible contracts as found by the bankruptcy court and by the district court. And I'll get to the contract provision here in a second, but summarily, I mean, the debtor is assigned to purchase the supply agreement in its entirety as required under the bankruptcy code. The assignment in this case did not violate Thornhill, and we don't argue that a contract can be assigned in part. Contracts clearly have to be assigned in whole. And that's what happened here. The supply agreement was, in fact, assigned in whole. What didn't happen is the purchase orders were not assigned along with the supply agreement. Purchase orders on other supply agreements were, in fact, listed in the enumerated contracts to be assumed and assigned under the confirmation order and the sale order of the master asset purchase agreement. But the purchase orders on this supply agreement were not listed, so they were not enumerated. The intent of the parties, which is the primary question for the court in terms of determining severability, is best seen, is noted by an overwhelming number of courts which find that the absence of a purchase agreement in the supply agreement indicates that the purchase orders were not in fact severable. And that's what happened here. The supply agreement here did not include any agreement to purchase. The supply agreement did not have any agreement as to price. The supply agreement did not have any agreement as to delivery dates. All of that was supplied by the purchase agreements as provided, informed by and incorporating the terms of the supply agreements. But all of the purchase orders themselves were the operable agreements in terms of the execution of any transactions under the supply agreement. The supply agreement itself is devoid of any requirement of any party to purchase or sell anything. And the overwhelming number of courts, as we point out in our brief where this circumstance has come up, have found that the agreements were divisible. For example, in the Hawker Beechcraft case that we cite, you know, the master service agreement in Hawker was assigned under 365, but along with 365 purchase orders, however, 965 purchase orders were not assigned. And the court there noted that courts generally hold that the master agreements that do not contain purchase agreements are divisible from subsequent purchase orders containing a purchase agreement. And we think that is the main thing here. But there are other factors as well that I think bear on the intent of the parties here and show that they're severable. For one, you know, is there were different termination provisions. You could terminate a purchase order without terminating the supply agreement and without impacting other purchase orders. The purchase price itself was apportioned, and there are cases which hold that where the purchase prices were apportioned by each particular purchase order. You seem to be talking about sort of the way the parties dealt with each other under the purchase orders. The counsel opposite talked at length about the terms of the MSA and relied on specific parts of the MSA to demonstrate the indivisibility. So it would be helpful to me if you could respond to what they said. Sure. Well, starting with 17.7. 17.7 is a standard boilerplate integration clause that's intended to deal with the parole evidence rule. Their argument essentially conflates unrelated concepts of integration into visibility. I guess one thing they said was that there is an integration clause elsewhere in the MSA on page 1. I'm sorry? They said there was an integration clause elsewhere in the MSA. So I guess apart from section 17.7, what's your response to that? 17.7, I believe it is the integration clause. Yeah, well, they said there was another integration clause. I thought that's what they said. I don't know where it is. 17.2? 17.2 is an anti-assignment provision. And I can get to that, too, in a second. Okay. But you're saying that the 17.7, they call it the indivisibility clause. You're saying it's a standard integration clause. It's a standard boilerplate integration clause, you know, that's contained in the, basically in the boilerplate section of the contract, for lack of a better term. And as, you know, the same issue came up in ECHO, a Seventh Circuit case. They've addressed the same issue. And in that case, the ECHO court, Seventh Circuit, held that simply, that the clause simply means that various enumerated articles compose all of the dealings between the parties that may be used to provide the content of those dealings. So that you can't use parole evidence to, to bury the terms that are in the supply agreement and the purchase orders. They rejected the article, they rejected the argument, rather, that the clause unified purchase orders with a distribution agreement in that case. So, following the Seventh Circuit, the integration clause here simply doesn't do what they suggest that it does do. With respect to the anti-assignment clause, which is 17.2, and that's likewise not helpful to, to them. What they point to is a, is a provision in that paragraph, and I'll quote it, that basically says that the agreement, you know, in its entirety, parens including purchase orders and PIs, purchase invoices, you know, to take their interpretation violates the rule against surplusage, surplusage. The rule that basically says that courts try to give every word in the contract a meaning, and that they don't favor interpretations such as what they're suggesting, that would make certain words meaningless. And here, for example, if entirety, if entirety, if the contract is in fact one agreement, then the words including the purchase orders and purchase invoices, you know, would be surplusage. You wouldn't need to say it. I think the better reading, and really the only reasonable reading, frankly, in terms of that provision, is to look at the word including, which sometimes can be clarifying. For example, you know, you say vegetables including, you know, tomatoes, carrots, whatever. But it also, and I think in this case does mean, it's expansive, so it means and or or. So you would read the section in effect that the agreement in its entirety, parens, and the POs and PIs, and that would give, in fact, to all of the language in the contract. And we think that's the proper reading. The anti-assignment provision in and of itself, you know, to take one word, basically, and say that unifies contracts, you know, in opposition to, and ignore the fact that there's no purchase agreement contained in the, in the supply agreement is, make sure I don't run out of time, is not a rational argument. You know, they also, you know, they also point to 1.3 and other other sections of the contract that, frankly, are not helpful to them. You know, the fact that the supply agreement required the agreement to, you know, it applies to all purchase orders doesn't make it a unitary contract. Basically, the supply agreement was, the purchase orders were issued pursuant to it, but that doesn't affect divisibility of the agreements. Those terms, in fact, just are incorporated into the the purchase agreement. Likewise, I mentioned 6.2, which is the indemnity agreement. You know, purchase orders and the supply agreement had indemnity agreements. The indemnity, in this case, you know, has to survive with the purchase orders, has to survive with the, with Correll. And just to explain how that works, you know, basically, claims, in this case, was there indemnity claims typically survive the termination or the expiration of a contract, and here they would have to because the goods themselves were purchased pursuant to the purchase orders and paid for, and the purchase orders at that time were fully executed. In fact, one of the bankruptcy court's findings was that these aren't executory contracts anymore, but there still is a surviving requirement to indemnify, and that goes forward, and it's common in contracts for that indemnity obligation to survive termination or expiration, you know, of the contract. You just said, completed purchase order, so your company has sold a product to someone under a purchase order. There's a claim against you, and you would want to say, Medea indemnifies me. I'm still the customer with respect to that purchase order.  Okay. That's what we're saying. If they're right, what happens? Sorry? If they're right, if the other side is right about how all this is supposed to work, what happens in that circumstance? Well, they're looking for a windfall. What they're looking for is— What happens to you in that circumstance? Well, I mean, if we don't have a claim for indemnity under the plan, we are responsible for product liability claims. Okay, so claim against you based on a completed purchase order, you're on the hook for that. You can't claim indemnity. Right. Okay. So we're saying if the indemnity obligation in the purchase orders stays with us, you know, obviously, you know, that's who the—the claim stayed with us. That's where the claim would be asserted, and, you know, and it would make no sense, frankly, to say that the indemnity falls off, you know, when the—after the purchase order is completed, for example, because that, you know, before the product may even be put into the stream of commerce, but moreover, what they're looking for is a windfall. They want to be released from the indemnity obligation with respect to these completed purchase orders, and— If they're right and you—a claim was against you through a purchase order, if they're correct, let's say—let's say they're correct, you couldn't then point to the person you assign—I forget who the assignee of the MSA is, but you couldn't point to the assignee of the MSA and say, well, you're the ones. We could not. No. The agreement provides that— I guess you couldn't tell them to sue them. We couldn't— No, you couldn't do that. You might want to, but— Yeah. We couldn't sue the buyer. In fact, the agreement is very clear that it cuts off any liabilities that occurred, you know, before the closing. So no, we have no remedies, and in fact, it leaves the—it leaves the buyer, the personal injury claimants, it leaves them at a significant disadvantage because what they're left with is a claim in bankruptcy under their interpretation, which would—frankly, it's an insecure claim. It's not a lot of value, and—as opposed to a claim against, you know, an indemnity that is solvent and could satisfy their claims. So it's very much a windfall for them. It is—would be a significant impediment to recovery by any personal injury claimant, and obviously a significant hardship for the bankruptcy estate. I want to go back and just address briefly the— because I think it's, frankly, overwhelming in our favor, where supply agreements do not contain purchase orders—I'm sorry, yeah, do not contain, you know, purchase agreements that the purchase orders that implement those supply agreements are, in fact, divisible. In the cases they cite, frankly, it doesn't—first of all, it doesn't violate Thornhill. Thornhill is entirely different, where they tried to assign a portion of a contract. You know, we assigned the entire contract again, and the question really becomes, you know, are the purchase orders part of that contract? You know, some of the other cases they cite, for example, the Shell, which is a fracking agreement, and that both parties agreed to, you know, performance, and although the contract, you know, provided—and the contract itself provided, it was unitary. You know, Charleston Marines was a requirements contract, where there was a purchase agreement, and in fact, the purchase agreement found—provided that it couldn't be varied by subsequent purchase orders. You know, they mentioned the Ballad of Warren case. They cite that in their brief. You know, in that case, again, the parties stipulated it was unitary, and that—and basically, that case was a gist of the action case in any event. It involved damages and whether or not a party could bring an action for fraud where there was a contract involved, and the Court found that the gist of action theory under Pennsylvania law prohibited the assignment. I do want to address our alternative argument that was raised in the Bankruptcy Court, but not—and in the District Court, and not reached here, and that is that the indemnity claims themselves were specifically retained under the—under the applicable agreements and the plan, and under contract law, it's clear that those that—claims arising out of a contract are separate and apart from the contract, such that you could assign the contract here, the supply agreement, but retain claims, which in this case would be the indemnity claims, against, you know, third parties, and that theory would apply here in the event—you know, I think the unlikely event the Court were to find that the supply agreement and purchase orders were not divisible, even if the purchase orders went, the retained claims for indemnity were property of the estate, and those claims would survive and stay with the estate, and, again, under general contract law, and specifically with respect to indemnity claims, that's all that really makes sense, is that an indemnity claim would survive termination or, you know, of the contract or, you know, the expiration of a contract. For example, you know, a dealer that's indemnified by the manufacturer, you know, once the dealership signed the agreement were it to expire, any claims for indemnity for accidents or personal injuries, cars sold while it was in effect, would still be a good indemnity claim. And I see my time is just about up. You don't have to take the whole time if you don't need to. No, I know.  Okay. You know, I would just end with saying, you know, the bankruptcy court here and the district court got it right, and their opinion should be helped. Okay. Thank you. Thank you. We'll now hear the rebuttal. Just briefly, Your Honor, I want to respond to three things. The first is, I haven't actually heard an explanation from Appellee regarding the fact that a boilerplate integration clause already exists in the agreement and that Section 17.7 has language different from the boilerplate integration clause. And just for the record, I'll note that the — Well, why can't they both be integration clauses? I mean, I'm reading them right now. Yeah, there's a very general integration clause on page 1. Correct. And then 17.7 also sounds like an integration clause. Can't there just be two? There could be two. However, that would not be consistent with, I think, applicable contract law on how to interpret an agreement, because the language of the two provisions are not entirely the same. And the part that is the same is what you would typically consider to be a boilerplate integration and merger language, which is the part of the provision that refers to the entire agreement between the parties. But the part that comes before that in Section 17.7 has, again, very unique intentional language that has been inserted that references incorporation by reference into the agreement and the purchase orders being made a part thereof. That has to have some meaning, and it has to have meaning different than what a boilerplate integration clause provides. And, frankly, their failure to explain what this language could otherwise mean, combined with the other provisions, express provisions in this agreement, is, in our view, fatal to their arguments. I also want to address briefly the case law, because the case law supports my idea's view. I'll briefly address Shell Western. In Shell Western, master services agreement there provided a framework under which the parties entered into separate contracts. The master service agreement did not provide for the performance of any specific work or any specific price. Instead, it required the issuance of work orders, and upon acceptance of the work orders, they would become a part of the master service agreement. The court there held that the master services agreement and related purchase orders were one contract, where the master supply agreement was defined to include any change in scope of work pricing or other terms found in another document, had a general integration clause provided that the contract term shall prevail over any purchase order, and nowhere stated that a purchase order was a separate contract. Those facts are consistent with the situation here. There is plain language in this agreement that demonstrates that both the master supply agreement and the purchase orders are intended to be interdependent, indivisible agreements. Further, in Dick's Sporting Goods, Third Circuit held that the vendor agreement and purchase orders were one contract because the integration clause was clear, and the vendor agreement expressly applied to all purchase orders, notwithstanding that some terms like price and quantity were contained in the purchase orders themselves and not the vendor agreement. The vendor agreement defined those terms in relation to the purchase orders, which is exactly what the master supply agreement here does. There are also many grounds to distinguish Hawker Beechcraft and ECHO, the two cases that appellees primarily rely on. In Hawker Beechcraft, the court noted that the integration clause, which was a boilerplate provision, expressly omitted reference to purchase orders. The court also found that although the master supply agreement made additional appendices apart of the master supply agreement, it did not expressly do the same for the purchase orders. Importantly, I highlight that the language the court relied upon to determine that the additional appendices were made apart of the master supply agreement bears striking similarity to the language here. And I'll quote, the language in Hawker Beechcraft said, to the extent that one, all, or any combination of additional appendices are required, they will be incorporated in the individual purchase orders generating the requirement and shall be considered as part of this MSA. Again, that latter language bears a striking similarity to the made apart hereof language that appears in Section 17.7 of the master supply agreement here. Additionally, for ECHO, that case applies Illinois law in a very specific context of distributorship agreement. Second, the purchase order stated that the provisions of the distributorship agreement would be deemed a part of each purchase order to the extent the purchase order conflicted, reflecting, as the court noted there, a narrow sphere of influence. Lastly, the boilerplate merger or integration language in ECHO did not include language found here in the MSA incorporating each purchase order by reference and making it a part of the MSA. Okay. Your time is up. We appreciate both sides' arguments. The case is now under submission. We have one more.